No. 23-35485

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

M.H., T.B.,

*Plaintiffs-Appellees*,

v.

DR. MAGNI HAMSO, in her official capacity
as the Medical Director of the Idaho Division of Medicaid and individually,

*Defendant-Appellant,*

AND

DAVE JEPPESEN, in his official capacity as the Director of the Idaho Department
of Health and Welfare; IDAHO DEPARTMENT OF HEALTH AND WELFARE,

*Defendants.*

On Appeal from the United States District Court for the District of Idaho
Case No. 1-22-cv-00409-REP, Hon. Raymond Edward Patricco, Jr.

## BRIEF FOR THE APPELLANT

RAUL R. LABRADOR
*Attorney General*
JOSHUA N. TURNER
*Acting Solicitor General*
AARON M. GREEN
JAMES E.M. CRAIG
IDAHO OFFICE OF
THE ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720
(208) 334-2400
josh.turner@ag.idaho.gov

GENE C. SCHAERR
JOHN J. NIELSEN
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Defendant-Appellant Dr. Magni Hamso, in her official capacity
as the Medical Director of the Idaho Division of Medicaid and individually*

DECEMBER 27, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant states that no nongovernmental corporation is a party to this appeal.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ................................................................ 1

STATEMENT OF JURISDICTION ................................................................ 2

ISSUES FOR REVIEW ................................................................ 3

    A.    JURISDICTION. ................................................................ 3

    B.    FAILURE TO STATE AN EQUAL PROTECTION CLAIM. ................................................ 3

    C.    QUALIFIED IMMUNITY ON EQUAL PROTECTION CLAIM. ................................ 4

    D.    QUALIFIED IMMUNITY ON DUE PROCESS CLAIM. ............................................ 4

STATEMENT OF THE CASE ................................................................ 5

    A.    ALLEGED FACTS. ................................................................ 5

    B.    PROCEEDINGS. ................................................................ 6

    C.    MOTION TO DISMISS. ................................................................ 6

    D.    RULING. ................................................................ 7

SUMMARY OF THE ARGUMENT ................................................................ 9

    A.    THIS COURT HAS JURISDICTION. ................................................................ 9

    B.    PLAINTIFFS FAILED TO STATE AN EQUAL PROTECTION CLAIM. ...................... 9

    C.    DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL
           PROTECTION CLAIMS. ................................................................ 10

    D.    DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE DUE
           PROCESS CLAIMS. ................................................................ 10

STANDARD OF REVIEW ................................................................ 11

ARGUMENT ................................................................ 12

    I.    THIS COURT HAS JURISDICTION TO DECIDE BOTH THE QUALIFIED
        IMMUNITY ISSUES AND WHETHER PLAINTIFFS HAVE A VALID EQUAL
        PROTECTION CLAIM. ................................................................ 12

    II.    PLAINTIFFS DID NOT STATE A VALID EQUAL PROTECTION CLAIM BOTH
        BECAUSE THE SURGERY EXCLUSION HERE DOES NOT APPLY BASED ON
        GENDER, AND PLAINTIFFS DID NOT PLEAD PROXY DISCRIMINATION. ......... 14

III. ALTERNATIVELY, DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIMS BECAUSE NO BINDING CASE GAVE HER FAIR NOTICE THAT IT WAS CLEARLY ILLEGAL TO DENY COVERAGE FOR THE REQUESTED SURGERIES, AND THE EXTANT PRECEDENT ON THE STATES' AUTHORITY UNDER MEDICAID AND ON TRANSGENDER RIGHTS WAS MIXED. ........................................................... 19

    A.    The district court defined the asserted equal-protection right at much too high a level of generality ....................................................... 20

    B.    There is no controlling authority or other consensus on the limits of State discretion to regulate the medical procedures funded by Medicaid generally, let alone these specific procedures. ......................................................................................... 29

    C.    There is no controlling authority or other consensus on the full extent of individuals' rights to receive coverage for particular gender-dysphoric treatments under Medicaid .................................... 32

IV. THE DISTRICT COURT ERRED BY DENYING QUALIFIED IMMUNITY TO DR. HAMSO ON PLAINTIFFS' DUE PROCESS CLAIMS GIVEN THE LACK OF PROPERTY INTEREST IN A SURGERY THAT HAS NOT BEEN COVERED UNDER IDAHO LAW. ........................................................................ 41

CONCLUSION ............................................................................................ 44

STATEMENT OF RELATED CASES ......................................................... 46

CERTIFICATE OF COMPLIANCE ............................................................ 47

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
  495 F.3d 695 (D.C. Cir. 2007) ................................................................. 29

*Abramson v. Brownstein,*
  897 F.2d 389 (9th Cir. 1990) .................................................................. 14

*Adams by & through Kasper v. Sch, Bd. of St. John's Cnty.,*
  57 F.4th 791 (11th Cir. 2022) ................................................................. 36

*Anderson v. Creighton,* 483 U.S. 635 (1987) ............................... 21, 23, 24, 27, 39

*Ashcroft v. al-Kidd,* 563 U.S. 731 (2011) ............................ 12, 21, 22, 23, 24, 26

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ................................................... 14

*Bd. of Regents of State Colls. v. Roth,*
  408 U.S. 564 (1972) ......................................................................... 41, 42

*Beal v. Doe,*
  432 U.S. 438 (1977) ................................................................ 7, 30, 31, 42

*Bostock v. Clayton Cnty.,*
  140 S. Ct. 1731 (2020) ..................................................................... 37, 39

*Boyd v. Benton Cnty.,*
  374 F.3d 773 (9th Cir. 2004) ........................................................ 21, 23, 25, 27

*Boyden v. Conlin,*
  341 F. Supp. 3d 979 (W.D. Wisc. 2018) ................................................... 34

*Brosseau v. Haugen,*
  543 U.S. 194 (2004) ......................................................................... 24

*Campbell v. Kallas,*
  936 F.3d 536 (7th Cir. 2019) ............................................................... 35

*Cervantes v. City of San Diego,*
  5 F.3d 1273 (9th Cir. 1993) ................................................................ 14

*City & Cnty. of S.F. v. Sheehan,*
  575 U.S. 600 (2015) ....................................................................... 24, 27

*Clark v. Quiros,*
  No. 3:19-cv-00575-VLB, 2023 WL 6050160
  (D. Conn. Sept. 15, 2023) .................................................................. 34

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986) ............................................................................... 7

*Dandridge v. Williams*,
  397 U.S. 471 (1970) ............................................................................. 40

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ............................................ 3, 12, 13, 26

*Davis v. Guam*,
  932 F.3d 822 (9th Cir. 2019) ............................................................. 17

*Dekker v. Weida*,
  No. 4:22-cv-325-RH-MAF, 2023 WL 4102243
  (N.D. Fla. June 21, 2023) ................................................................... 32

*Denise R. v. Lavine*,
  383 N.Y.S.2d 568 (N.Y. 1976) ........................................................... 34

*Detgen ex rel. Detgen v. Janek*,
  945 F. Supp. 2d 746 (N.D. Tex. 2013) ............................................. 44

*Dexter v. Kirschner*,
  984 F.2d 979 (9th Cir. 1992) ....................................................... 39, 40

*District of Colombia v. Wesby*,
  583 U.S. 48 (2018) ............................................................................. 25

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ........................................................................... 29

*Doe by & through Doe v. Petaluma City Sch. Dist.*,
  54 F.3d 1447 (9th Cir. 1995) ............................................................. 26

*Doe v. Minn. Dep't of Pub. Welfare*,
  257 N.W.2d 816 (Minn. 1977) .......................................................... 34

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ........................................................ 32, 33

*Druley v. Patton*,
  601 F. App'x 632 (10th Cir. 2015) .................................................... 35

*E.S. v. Regence BlueShield*,
  No. 2:17-cv-01609-RAJ, 2022 WL 279028
  (W.D. Wash. Jan. 31, 2022) ............................................................... 17

v

*Edmo v. Corion, Inc.*,
935 F.3d 757 (9th Cir. 2019) ................................................................ 35

*Eknes-Tucker v. Governor of Ala.*,
80 F.4th 1205 (11th Cir. 2023) ............................................................. 15

*Elliot-Park v. Manglona*,
592 F.3d 1003 (9th Cir. 2010) .............................................................. 20

*Etsitty v. Utah Transit Auth.*,
502 F.3d 1215 (10th Cir. 2007) ............................................................ 39

*Fain v. Crouch*,
618 F. Supp. 3d 313 (S.D.W.V. 2022) .................................................. 35

*Fields v. Smith*,
653 F.3d 550 (7th Cir. 2011) ................................................................ 35

*Flack v. Wisc. Dep't of Health Servs.*,
395 F. Supp. 3d 1001 (W.D. Wis. 2019) .............................................. 34

*Fletcher v. Alaska*,
443 F. Supp. 3d 1024 (D. Alaska 2020) ............................................... 34

*Flores v. Pierce*,
617 F.2d 1386 (9th Cir. 1980) .............................................................. 20

*Garrido v. Dudek*,
731 F.3d 1152 (11th Cir. 2013) ............................................................ 31

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ...................................................... 6, 7, 15, 16, 17, 18

*Gerhart v. Lake Cnty.*,
637 F.3d 1013 (9th Cir. 2011) .............................................................. 42

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) ................................................................ 35

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ............................................................................... 9

*Gonzales v. Carhart*,
550 U.S. 124 (2007) .............................................................................. 31

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ................................................................ 36

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ............................................................ 26

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ............................................................ 21

*Harris v. McRae*,
  448 U.S. 297 (1980) ............................................................ 30

*Harrison v. Kernan*,
  No. 16-cv-07103-RMI, 2021 WL 4295303
  (N.D. Cal. 2021) ................................................................. 39

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  599 U.S. 166 (2023) ............................................................ 31

*Hecox v. Little*,
  79 F.4th 1009 (9th Cir. 2023) ......................................... 37, 38

*Heller v. Doe*,
  509 U.S. 312 (1993) ............................................................ 29

*Hicklin v. Precynthe*,
  No. 4:16-cv-01357-NCC, 2018 WL 806764
  (W.D. Mo. Feb. 9, 2018) ................................................... 35

*Hunter v. Bryant*,
  502 U.S. 224 (1991) ............................................................ 25

*Hydrick v. Hunter*, 669 F.3d 937 (9th Cir. 2012) ................... 12

*Iglecias v. Fed. Bureau of Prisons*,
  No. 19-CV-415-NJR, 2021 WL 6112790
  (S.D. Ill. Dec. 27, 2021) ..................................................... 35

*Jones v. Union Cnty. Sheriff's Off.*,
  No. 3:18-cv-509-KDB-DCK, 2019 WL 7708935
  (W.D.N.C. Sept. 23, 2019) ............................................. 34, 35

*K.C. v. Individual Members of Med. Licensing Bd.*,
  No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086
  (S.D. Ind. June 16, 2023) ................................................... 32

*Kadel v. Folwell*,
  620 F. Supp. 3d 339 (M.D.N.C. 2022) .............................. 34

*Karnoski v. Trump,*
   926 F.3d 1180 (9th Cir. 2019) .................................................................. 37, 38

*Katie A., ex rel. Ludin v. Los Angeles Cnty.,*
   481 F.3d 1150 (9th Cir. 2007) ........................................................................ 30

*Keates v. Koile,*
   883 F.3d 1228 (9th Cir. 2018) .......................................................................... 5

*Kosilek v. Spencer,*
   774 F.3d 63 (1st Cir. 2014) ............................................................................. 35

*Kothmann v. Rosario,*
   558 F. App'x 907 (11th Cir. 2014) .................................................................. 35

*L.W., by and through Williams v. Skrmetti,*
   73 F.4th 408 (6th Cir. 2023) ............................................. 18, 31, 32, 33, 38

*L.W. by and through Williams v. Skrmetti,*
   83 F.4th 460 (6th Cir. 2023) ............................................ 18, 19, 29, 31, 36, 37

*Lange v. Houston Cnty.,*
   499 F. Supp. 3d 1258 (M.D. Ga. 2020) ......................................................... 34

*Lee v. City of Los Angeles,*
   250 F.3d 668 (9th Cir. 2001) .......................................................................... 14

*M.F. ex rel. R.L. v. Magellan Healthcare, Inc.,*
   No. 20CV3928, 2021 WL 1121042
   (N.D. Ill. Mar. 24, 2021) .......................................................................... 43, 44

*Maher v. Roe,*
   432 U.S. 464 (1977) ......................................................................................... 30

*Malley v. Briggs,*
   475 U.S. 335 (1986) ......................................................................................... 23

*Manning v. Goord,*
   No. 05-CV-850F, 2010 WL 883696
   (W.D.N.Y. Mar. 8, 2010) ................................................................................ 35

*Marbury v. Madison,*
   5 U.S. 137 (1803) ............................................................................................. 25

*Mejia v. Miller,*
   53 F.4th 501 (9th Cir. 2022) ........................................................................... 13

*Mitchell v. Forsyth*,
472 U.S. 511 (1985)..............................................................12, 21, 22, 26, 27, 37

*Mullenix v. Luna*,
577 U.S. 7 (2015) .................................................................................... 24

*Murray v. U. S. Bureau of Prisons*,
106 F.3d 401 (Table), 1997 WL 34677 (6th Cir. 1997) ....................... 35

*Pac. Shores Props., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013).............................................................. 17

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020).............................................................. 36

*Pearson v. Callahan*,
555 U.S. 223 (2009)............................................................................... 36

*Pelletier v. Fed. Home Loan Bank*
*of S.F.*, 968 F.2d 865 (9th Cir. 1992) ...........................................12, 13

*Pettibone v. Russell*,
59 F.4th 449 (9th Cir. 2023)...........................................................9, 12, 13

*Poe v. Drummond*,
No. 23-CV-177-JFH-SH, 2023 WL 6516449
(N.D. Okla. Oct. 5, 2023) .................................................................. 32

*Poe v. Labrador*,
No. 1:23-cv-00269-BLW, slip op. (D. Idaho Dec. 26, 2023) ................ 36

*Reichle v. Howards*, 566 U.S. 658 (2012) ...........................................22, 27

*Ressler v. Pierce*,
692 F.2d 1212 (9th Cir. 1982)............................................................... 43

*Rico v. Ducart*,
980 F.3d 1292 (9th Cir. 2020)............................................................... 11

*Roe v. Critchfield*,
No. 1:23-cv-00315, 1012 WL 6690596
(D. Idaho Oct. 12, 2023) .................................................................... 36

*Roe v. Wade*,
410 U.S. 113 (1973)............................................................................... 29

*Roschen v. Ward*,
279 U.S. 337 (1929)............................................................................... 17

*Rosen v. Goetz,*
   410 F.3d 919 (6th Cir. 2005) ........................................................... 44

*Rush v. Parham,*
   625 F.2d 1150 (5th Cir. 1980) ......................................................... 30

*Salaam v. Stock,*
   No. 9:19-cv-00689-AMN-TWD, 2023 WL 3579770
   (N.D.N.Y. May 22, 2023) ................................................................ 38

*Saucier v. Katz,*
   533 U.S. 194 (2001) ................................................................... 22, 23

*Scheuer v. Rhodes,*
   416 U.S. 232 (1974) ........................................................................ 21

*Sharp v. Cnty. of Orange,*
   871 F.3d 901 (2017) .................................................................. 28, 33

*Smith v. Rasmussen,*
   249 F.3d 755 (8th Cir. 2001) ........................................................... 30

*Soneeya v. Spencer,*
   851 F. Supp. 2d 228 (D. Mass. 2012) ............................................. 35

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001) ...................................................... 11, 14

*Taylor v. Barkes,*
   575 U.S. 822 (2015) ........................................................................ 24

*Taylor v. Riojas,*
   592 U.S. 7 (2020) ............................................................................ 25

*Tigner v. Texas,*
   310 U.S. 141 (1940) ........................................................................ 19

*Town of Castle Rock v. Gonzales,*
   545 U.S. 748 (2005) ........................................................................ 42

*United States ex rel. Chunie v. Ringrose,*
   788 F.2d 638 (9th Cir. 1986) ........................................................... 11

*United States v. Ritchie,*
   342 F.3d 903 (9th Cir. 2003) ........................................................... 14

*United States v. Virginia,*
   518 U.S. 515 (1996) ........................................................................ 39

*Vista Hill Found., Inc. v. Heckler,*
767 F.2d 556 (9th Cir. 1985) ................................................................. 31

*Ward v. Cnty. of San Diego,*
791 F.2d 1329 (9th Cir. 1986) ............................................................... 26

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ................................................................................. 29

*Wedges/Ledges of Cal., Inc. v. City of Phoenix,*
24 F.3d 56 (9th Cir. 1994) ...................................................................... 42

*Whitaker by & through Whitaker v. Kenosha Unified Sch. Dist. No. 1,*
858 F.3d 1034 (7th Cir. 2017) ............................................................... 36

*White v. City of New York,*
206 F. Supp. 3d 920 (S.D.N.Y. 2016) ................................................... 38

*White v. Pauly,*
580 U.S. 73 (2017) ................................................................................... 24

*Wilkie v. Robbins,*
551 U.S. 537 (2007) ......................................................................9, 12, 13

*Wilkinson v. Torres,*
610 F.3d 546 (9th Cir. 2010) ................................................................. 12

*Williams v. Kelly,*
818 F. App'x 353 (5th Cir. 2020) .......................................................... 35

*Williamson v. Lee Optical of Okla., Inc.,*
348 U.S. 483 (1955) ................................................................................. 17

*Wilson v. Layne,*
526 U.S. 603 (1999) ...........................................................................27, 28

**Statutes**

28 U.S.C. § 1291 ............................................................................................ 12

28 U.S.C. § 1331 .............................................................................................. 2

28 U.S.C. § 1343(a) ......................................................................................... 2

28 U.S.C. § 2201 .............................................................................................. 2

28 U.S.C. § 2202 .............................................................................................. 2

42 U.S.C. § 1396a(a)(17) .............................................................................. 31

42 U.S.C. § 1983 .............................................................................................. 2

**Regulations**

42 C.F.R. § 431.220(b) ................................................................ 43

42 C.F.R. § 440.230 ................................................................... 30

42 C.F.R. § 440.230(d) .......................................................... 30, 41

**Other Authorities**

Jon Brooks,
*The Controversial Research on 'Desistance' in Transgender Youth*,
KQED (May 23, 2018) ................................................................ 15

William Byne et al.,
*Gender Dysphoria in Adults: An Overview and Primer for Psychiatrists*,
18 Focus 336, 340 (2020) .......................................................... 15

Nathan S. Chapman,
*Fair Notice, The Rule of Law, and Reforming Qualified Immunity*,
75 Fla. L. Rev. 1, 16 (2023) ................................................... 22, 23

Ctrs. for Medicare & Medicaid Servs.,
*CAG-00446N, Gender Dysphoria and Gender Reassignment Surgery*
(June 2, 2016) .......................................................................... 33

Elliott Davis, Jr.,
*States that Have Restricted Gender-Affirming Care for*
*Trans Youth in 2023*, U.S. News (Sept. 27, 2023, 2:15 PM) ......................... 33

Tyler Finn,
Note, *Qualified Immunity Formalism: "Clearly Established Law"*
*and the Right to Record Police Activity*, 119 Colum. L. Rev. 445 (2019) ........... 26

Movement Advancement Project,
*Healthcare Laws and Policies: Medicaid Coverage for*
*Transgender-Related Health Care* (Aug. 26, 2023) ................................. 33

**INTRODUCTION**

Qualified immunity exists to give officials breathing room to make decisions in areas of legal uncertainty. That breathing room is particularly needed on constitutional questions that, as in this case, arise from hot-button social or political matters such as the transgender issues that have come to dominate the headlines—prompting vigorous debate, legislation, and administrative actions. The resulting policies span the political spectrum, and the resulting court cases vary widely in results—thereby creating precisely the kind of legal uncertainty for which qualified immunity is designed.

During the period relevant to the current case, neither the United States Supreme Court nor this Court had held that excluding sex reassignment surgeries to treat gender dysphoria from coverage under Medicaid violates the Constitution. Existing cases on this and related subjects were at odds with each other, and many of them supported the actions taken by Dr. Hamso.

Yet the district court believed Dr. Hamso was not entitled to qualified immunity here on equal protection claims because a general principle of non-discrimination is clearly established in the law. But that frames the asserted right at too high a level of generality. Given States' discretion un-der Medicaid to determine medical necessity of treatments and Supreme Court precedent permitting distinctions based on procedure rather than gender, it is reasonable for a State to conclude that a decision to cover one form of treatment (surgery) for some maladies (cancer, serious injury) but not another (gender dysphoria) was not discriminatory.

On due process, the trial court also believed that a general property interest in the receipt of benefits was clearly established. But again, that states it too generally. A State official could reasonably decide that there was no property interest in the sought-for procedure here: Medicaid-funded sex-reassignment surgery. No such right was (or now is) clearly established.

On these undisputed facts, Dr. Hamso is entitled to qualified immunity, and this Court should reverse. Indeed, an affirmance in these circumstances—based on asserted constitutional rights articulated at a very high level of generality—would effectively destroy qualified immunity for any State officials who exercise substantial discretion in their service to fellow citizens.

## STATEMENT OF JURISDICTION

The Plaintiffs here, M.H. and T.B., brought suit under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), §§ 2201-02, and 42 U.S.C. § 1983, alleging (in relevant part) that Dr. Hamso violated their rights to procedural due process and equal protection by denying Medicaid coverage of sex-reassignment surgery. They sought both injunctive relief (in Dr. Hamso's official capacity) and monetary damages (in Dr. Hamso's personal capacity). Dr. Hamso moved to dismiss the constitutional and damages claims as barred by qualified immunity, and moved to dismiss the equal protection claim for failure to state a claim. On June 20, 2023, the district court denied Dr. Hamso's motion to dismiss. On July 18, 2023, Dr. Hamso and Idaho timely filed their notice of appeal from that order. ER-220-23. Orders denying qualified immunity are immediately appealable. *See*

*Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 613 (9th Cir. 2018). Because this Court ordered the parties to address jurisdiction in their briefs, *see* Order of Aug. 7, 2023, Dr. Hamso addresses it more fully in Section A below.

## ISSUES FOR REVIEW

### A.    JURISDICTION.

The United States Supreme Court has held—and this Court has recognized—that orders denying qualified immunity on purely legal grounds are immediately appealable as of right. *See Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 613 (9th Cir. 2018). The trial court here denied Dr. Hamso qualified immunity on purely legal grounds, ER-063-95, and Idaho and Dr. Hamso immediately appealed. ER-220-23. Does this Court have jurisdiction over this appeal?

### B.    FAILURE TO STATE AN EQUAL PROTECTION CLAIM.

Dr. Hamso moved to dismiss the equal protection claim for failure to state a claim because the alleged basis for discrimination (transgender status) did not account for having transgender persons on both sides of the line here. ER-166-69. The district court ruled that the complaint adequately alleged proxy discrimination, but did not account for significant gaps in the complaint and the requirements for proxy discrimination. Alternatively, it ruled that the challenged action was facially discriminatory on the basis of sex, but did not realize that policy in this area cannot help but refer to sex. ER-080-85. Did Plaintiffs adequately plead their equal protection claim?

3

### C.   QUALIFIED IMMUNITY ON EQUAL PROTECTION CLAIM.

Dr. Hamso moved to dismiss this claim on qualified immunity grounds. ER-164-76. The district court denied Dr. Hamso qualified immunity on M.H. and T.B.'s equal-protection claims regarding their treatment options for gender dysphoria. ER-086-91. Qualified immunity is appropriate if the answer to a legal question has not been clearly established and is beyond reasonable debate. The United States Supreme Court has never addressed whether a state may constitutionally deny funding for particular medical treatments for a particular ailment under Medicaid; Circuit authority on the question (and related questions) is mixed; and the States are actively legislating in this area. Are M.H. and T.B.'s equal-protection claims subject to reasonable debate?

### D.   QUALIFIED IMMUNITY ON DUE PROCESS CLAIM.

Dr. Hamso moved to dismiss this claim on qualified immunity grounds. ER-164-76. The district court also denied Dr. Hamso qualified immunity on M.H. and T.B.'s due-process claims. ER-091-94. Procedural due process claims for deprivation of a property right do not lie where government officials have the discretion to grant or deny a benefit. Under the Medicaid Act, states have flexibility to choose the appropriate procedures for a given condition. M.H. and T.B. claim a property right to a particular procedure addressing gender dysphoria—sex reassignment surgery—for which Idaho has elected not to provide coverage under Medicaid. Do they have valid procedural due process claims?

## STATEMENT OF THE CASE[1]

### A. ALLEGED FACTS.

M.H. and T.B. identify as transgender women who qualify for Idaho's Medicaid coverage. ER-179. Both have been diagnosed with gender dysphoria, which is the cognitive dissonance stemming from a mismatch between their sex (male) and their inner sense of gender identity (female). ER-179-80; ER-196-97; ER-205-06. Treatments for gender dysphoria include social transition (dressing and speaking as a female, using female pronouns, etc.), legal transition (altering birth certificates, etc.) and medical transition (hormone therapy and sometimes surgery). ER-179, ER-187-88.

M.H. and T.B. have socially and legally transitioned and partly medically transitioned, undergoing hormone therapy and other non-surgical treatment. ER-180, ER-197-98, ER-205-06. Both sought pre-approval for Medicaid to cover surgeries to remove their male genitalia, which treatment is recommended by several medical associations and that their respective doctors believed would "alleviate" their gender dysphoria. ER-180-81, ER-188-90, ER-205-08.

Idaho's Department of Health and Welfare (IDHW) denied M.H.'s first request, saying that a surgical candidate must undergo at least 12 months of hormone therapy first. ER-181, ER-199. M.H. requested an administrative hearing, and presented

---

[1] Because this case stems from a denial of a motion to dismiss, Hamso recites the alleged facts in the light most favorable to the non-moving parties—M.H. and T.B.—even though Dr. Hamso believes that many of the facts as alleged are not accurate. *See, e.g., Keates v. Koile*, 883 F.3d 1228, 1234-35 (9th Cir. 2018).

evidence that she complied with that requirement. ER-181, ER-199-200. IDHW responded that there was an additional reason for the denial: it had determined that the requested surgery was cosmetic, and thus not medically necessary. ER-180-81. On remand from that hearing, IDHW did not provide further reasons for the denial, and refused further hearings on the matter. ER-181; ER-182; ER-204.

T.B. requested pre-approval for surgery, which IDHW neither approved nor denied. ER-182; ER-205-10.

## B. PROCEEDINGS.

M.H. and T.B. filed a complaint about a year and a half later, alleging (relevant here) that Dr. Hamso (1) violated their right to equal protection under the Fourteenth Amendment by (functionally) denying funding for the surgery based on transgender status; and (2) denied their right to procedural due process by not providing additional reasons for the denial or granting further administrative hearings. ER-213-16. They requested both injunctive relief against Dr. Hamso in her official capacity, and money damages in her individual capacity. ER-217-18.

## C. MOTION TO DISMISS.

Dr. Hamso moved to dismiss the equal protection count for failure to state a claim, and moved to dismiss all claims against her in her individual capacity based on qualified immunity. ER-164-76. On the failure to state a claim for equal protection, Dr. Hamso argued that *Geduldig v. Aiello*, 417 U.S. 484 (1974), settled the issue. There, California's definition of "disability" in its workers' compensation statute excluded

pregnancy. *Id.* at 486. Though only women could become pregnant, the Supreme Court held that there was no equal protection problem because the decision was based on condition, not gender. *Id.* at 496 n.20. Likewise here, the exclusion existed for a condition rather than a status. ER-166-69; ER-108-09.

On qualified immunity for equal protection, Dr. Hamso showed that no binding precedent placed her position "beyond debate." ER-173; ER-110-13 (citing cases). On qualified immunity for due process claims, Dr. Hamso argued that there was no protectible property right in a particular treatment—as opposed to *any* treatment—for gender dysphoria, ER-173-75; and at very least, that there was no clearly established property right to Medicaid-funded surgery to treat gender dysphoria. ER-113-16. Medicaid rules and regulations give the States broad discretion to determine the scope of covered procedures, and Idaho lacked a "definitively established law or policy" on authorizing surgery for gender dysphoria. ER-174-75 (citing *Beal v. Doe*, 432 U.S. 438, 440 (1977)). And this discretion defeated any expectation of a property interest, or at least made the ultimate outcome reasonably debatable. ER-115.

### D.   RULING.

The district court[2] denied Hamso's motion to dismiss. ER-063-95. It first ruled that M.H. and T.B. had stated viable equal protection claims. It began by reading the

---

[2] Magistrate Judge Patricco sat with authorization as the district court in this case, so Idaho refers to him as the "district court." *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) (authorizing parties to waive right to Article III tribunal and submit to binding judgment from Article I tribunal).

complaint as alleging proxy discrimination—that is, a facially neutral policy that disproportionately affected the plaintiffs—and determined that transgender persons were a quasi-suspect class. ER-082-83. It alternatively decided that the complaint supported "a claim of facial gender discrimination" because the sought-for procedures could not be explained without reference to sex. ER-084. The existence of proxy or facial discrimination made *Geduldig* inapposite, in the district court's view. ER-083-84, ER-089. The allegations sufficed, the district court concluded, because they alleged that transgender persons were being denied surgical treatments for gender dysphoria that cisgender persons got for *other* maladies. ER-085.

On qualified immunity for the equal protection claim, the district court defined the right at issue as "the right to be free from invidious discrimination," which right it found "clearly established." ER-089-90. Though it acknowledged that there was "some nuance" to the Equal Protection claims here—including the interplay of Medicaid and the Constitution—it believed that its task at this stage was limited to whether the allegations stated a "plausible violation" of the general nondiscrimination principle that it articulated—which, it concluded, they did. ER-090. It did note, however, that Dr. Hamso could later raise qualified immunity after further developing the record. ER-091.

On qualified immunity for the due process claim, the district court concluded that M.H. and T.B. had plausibly alleged a property interest in the sought-for Medicaid benefits because it was "well-settled that a person can have a property interest in

8

continuing to receive government benefits." ER-092-93. (citing *Goldberg v. Kelly*, 397 U.S. 254, 261-63 (1970)). And, because the sought-for surgeries were "routinely" available to cisgender Medicaid recipients when sought for other conditions, Plaintiffs had alleged a "claim of entitlement to coverage, not just [a] unilateral expectation of it." ER-094. Thus, the right to due process in determining eligibility for it was clearly established. ER-094.

Dr. Hamso timely appealed the qualified immunity issue. ER-220-23.

## SUMMARY OF THE ARGUMENT

### A. THIS COURT HAS JURISDICTION.

This Court has jurisdiction to decide both (1) Dr. Hamso's qualified immunity for equal protection and due process claims and (2) the failure-to-state-a-claim issue on the equal protection claim. Under *Wilkie v. Robbins*, 551 U.S. 537 (2007), and this Court's decision in *Pettibone v. Russell*, 59 F.4th 449 (9th Cir. 2023), federal appellate courts exercising jurisdiction over interlocutory appeals of qualified immunity also have jurisdiction to decide whether the underlying cause of action exists. A rule 12(b)(6) motion goes to the existence of the equal protection claim, and thus is properly before this Court.

### B. PLAINTIFFS FAILED TO STATE AN EQUAL PROTECTION CLAIM.

The district court ruled that Plaintiffs had adequately pleaded a proxy discrimination claim, but did not hold Plaintiffs to the correct pleading standards, because they did not plead animus or allege a fit between proxy and target. It

alternatively ruled that Plaintiffs had adequately alleged facial discrimination, but did not recognize that policy regarding surgeries affecting sex organs cannot help but refer to sex, but that does not make it facially discriminatory on the basis of sex.

## C. DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIMS.

The district court denied qualified immunity to Dr. Hamso even though the only case remotely on point at the time of the Complaint upheld the denial of a preliminary injunction against a Medicaid director who similarly denied benefits, despite plaintiffs' equal protection arguments. No other case in 2022 spoke to that issue, and apart from clarifying the quasi-suspect status of transgender classifications no case *today* speaks to this issue. No binding Supreme Court precedent, circuit precedent, or consensus of the circuits spoke with one voice to Medicaid directors, commanding the constitutionalizing of a Medicaid coverage decision normally reviewable under rational basis. To the contrary, the divide has only widened, as the Sixth Circuit and Eleventh Circuit have since held that states *may* restrict such surgeries in toto, let alone decline to pay for them through Medicaid.

## D. DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE DUE PROCESS CLAIMS.

Similarly, no due-process protection exists for property interests that Plaintiffs have nothing more than a unilateral expectation to receive and IDHW has discretion to deny. At the very least, the law in this area is unsettled, which alone suffices to grant Dr. Hamso qualified immunity protection. Appellees did not allege that IDHW did not

cover gender dysphoria at all—indeed, they said that they received services for the condition. Nor did they allege that they had previously received assurances of such treatment only to have it yanked out from under them. With no expectation of these specific benefits, they could not be denied procedural due process by withholding those benefits.

## STANDARD OF REVIEW

This Court reviews the denial of a motion to dismiss based on qualified immunity de novo. *Rico v. Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020). While this Court must take as true—for the purposes of a motion to dismiss—all well-pled factual allegations, not everything labeled as fact qualifies as fact. Legal conclusions do not qualify. *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643, n.2 (9th Cir. 1986). Nor do "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted).

Here, the Court has jurisdiction to decide both the qualified immunity issues and whether Plaintiffs have a valid equal protection claim. And under settled standards, as shown below, the district court's rulings on all these issues must be reversed.

# ARGUMENT

## I.  THIS COURT HAS JURISDICTION TO DECIDE BOTH THE QUALIFIED IMMUNITY ISSUES AND WHETHER PLAINTIFFS HAVE A VALID EQUAL PROTECTION CLAIM.

This Court has appellate jurisdiction over final orders from district courts. 28 U.S.C. § 1291. Although this usually means orders that end the litigation, that is not always true. Some collateral orders—like denials of qualified immunity—are immediately appealable. *Wilkie*, 551 U.S. at 548; *Mitchell v. Forsyth*, 472 U.S. 511, 526-27, 530 (1985); *see also Pettibone*, 59 F.4th at 452 ("Because qualified immunity is an immunity from suit rather than a mere defense to liability, the denial of a motion to dismiss is effectively final—and thus immediately appealable."). This is because qualified immunity is immunity from suit (as opposed to immunity from liability), which is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. 526. But immunity applies solely to money damages in an official's personal capacity, not to injunctive or declaratory relief in their official capacity. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Hydrick v. Hunter*, 669 F.3d 937, 939-40 (9th Cir. 2012).

Jurisdiction over such appeals generally does not extend to the full case, but is limited "exclusively to questions of law." *Daniels Sharpsmart*, 889 F.3d at 613 (quoting *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010)). Usually, that means deciding only the legal issue of whether there is immunity. In *Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865 (9th Cir. 1992), for example, the defendant law enforcement official appealed the district court's denial of qualified immunity as well as a *Bivens* issue of

whether the underlying cause of action existed. This Court rejected jurisdiction over the *Bivens* question as "outside the limited scope of th[e] interlocutory appeal" of a qualified immunity decision. *Pelletier,* 968 F.2d at 871.

But as this Court recently recognized, *Pelletier* and cases like it "predated the Supreme Court's decision in *Wilkie v. Robbins*, 551 U.S. 537 (2007)." *Pettibone*, 59 F.4th at 452. Since that time, appellate courts have had jurisdiction over not just the existence of qualified immunity, but "antecedent legal question[s] defining the claim." *Mejia v. Miller*, 53 F.4th 501, 502 (9th Cir. 2022) ("[T]he existence of the cause of action is an antecedent legal question defining the claim . . . and it is directly implicated by the defense of qualified immunity." (cleaned up)); *see also Pettibone*, 59 F.4th at 453 ("[I]n an interlocutory appeal from a denial of qualified immunity, [this Court] necessarily [has] jurisdiction to decide whether [the] underlying [] cause of action exists.").

This Court thus has jurisdiction to decide the validity of qualified immunity (on both constitutional claims) as well as the validity of the underlying equal-protection claim, because the latter is a purely legal question and antecedent to immunity on that claim. *See Pettibone*, 59 F.4th at 453; *Mejia*, 53 F.4th at 502; *see also Daniels Sharpsmart*, 889 F.3d at 613.

13

## II. PLAINTIFFS DID NOT STATE A VALID EQUAL PROTECTION CLAIM BOTH BECAUSE THE SURGERY EXCLUSION HERE DOES NOT APPLY BASED ON GENDER, AND PLAINTIFFS DID NOT PLEAD PROXY DISCRIMINATION.

The district court ruled that M.H. and T.B. had stated a valid equal protection claim because they alleged (1) facial claims of gender discrimination and, (2) alternatively, proxy discrimination. ER-083-85, ER-089. Neither holds up to scrutiny.

When deciding a motion to dismiss for failure to state a claim, courts are limited to the four corners of the complaint itself. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), '[r]eview is limited to the complaint.'") (citing *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993)).[3] While courts must view the complaint "in the light most favorable to the plaintiff," *Abramson v. Brownstein*, 897 F.2d 389, 391 (9th Cir. 1990), and accept all well-pleaded factual allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), they need not accept legal conclusions, unreasonable inferences, or "unwarranted deductions of fact." *Sprewell*, 266 F.3d at 988.

Here, the complaint alleges that IDHW grants cisgender people access to genital-reconstruction surgery (or "similar procedures") "as a matter of course" "for the treatment of other conditions" while "refus[ing] to cover" it for gender dysphoria. ER-

---

[3] There are some exceptions—not relevant here—for documents attached to the complaint, documents incorporated by reference into the complaint, and judicially noticeable materials. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

178-80. Thus, they conclude, they are being discriminated against on the basis of their transgender status. ER-178-79, ER-183.

The conclusion does not follow from the premise. Even reading the complaint in the light most favorable to Plaintiffs, the clear import of the policy is to condition the sought-after surgeries on the *condition* from which the person suffers rather than their gender identity. That is, a transgender person has the same access that a cisgender person has to genital-reconstruction surgery to treat conditions other than gender dysphoria—say, congenital defects, cancer, or traumatic injury. Thus, the policy does not discriminate on the basis of gender identity, and Plaintiffs have failed to state a valid equal-protection claim.

It is no answer on this point to say that only transgender people suffer from gender dysphoria. ER-185 at n.1; ER-082; ER-011.[4] *Geduldig* shows why. There, California had excluded pregnancy from its definition of "disability" in its workers' compensation statute. *Geduldig,* 417 U.S. at 486. Several women brought suit, claiming

---

[4] While no minors are involved in this case, there is a wide body of evidence showing a high desistance rate among those with childhood-onset gender dysphoria. *See* William Byne et al., *Gender Dysphoria in Adults: An Overview and Primer for Psychiatrists*, 18 Focus 336, 340 (2020), https://tinyurl.com/2nt4rauk (explaining that "the majority of those diagnosed with GID in early or early middle childhood 'desisted,' meaning that they subsequently identified as their birth-assigned gender and did not meet criteria for GID"); Jon Brooks, *The Controversial Research on 'Desistance' in Transgender Youth*, KQED (May 23, 2018), https://tinyurl.com/5n6kh7n2 (explaining that studies put desistance rate at "anywhere from 65 to 94 percent"); *see also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1217 (11th Cir. 2023) (discussing desistance testimony). That is, a cisgender person (at least in youth) can temporarily suffer gender dysphoria.

that because only women could become pregnant, this exclusion discriminated based on gender and violated equal protection. *Id.* at 487, 490. The Supreme Court disagreed, holding that the pregnancy exclusion was not "discrimination based upon gender as such" because it did "not exclude anyone from benefit eligibility because of gender, but merely remove[d] one physical condition—pregnancy—from the list of compensable disabilities." *Id.* at 496 n.20. "The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes." *Id.* There was "no risk from which men [were] protected and women [were] not," and vice-versa. *Id.* at 496-97.

Likewise here, the policy does not violate equal protection because members of both sexes and both gender identities in each combination lie on both sides of the exclusion—those wanting coverage for surgery to treat gender dysphoria and those *not* wanting coverage for surgery to treat gender dysphoria. ER-187 ¶ 44 (complaint, stating that "[g]ender affirming care *can* involve . . . surgery, or other services as indicated" in a given case) (emphasis added).

But, said the district court, *Geduldig* is inapposite because it included an exception for pretext or proxy discrimination. ER-083-84. And, in the district court's view, the complaint "effectively allege[d] that Defendants' no-surgery-for-gender-dysphoria policy is a proxy for discrimination against transgender persons." ER-084. But "effectively" pleading proxy discrimination requires much more.

16

Pleading proxy discrimination requires a plaintiff to allege "that distinctions [at issue] are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other," in the case of sex discrimination. *Geduldig*, 417 U.S. at 496, n.20. As the Supreme Court has held, "[t]he prohibition of the Equal Protection Clause goes no further than invidious discrimination," *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955), and a state law "is not invalid under the Constitution because it might have gone farther than it did." *Roschen v. Ward*, 279 U.S. 337, 339 (1929). At a minimum, a "discriminatory reason more likely than not" must animate the defendant's actions in a proxy discrimination case. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (citation omitted). And there must be some allegation of fit between the proxy and the target. *See Davis v. Guam*, 932 F.3d 822, 838 (9th Cir. 2019) (considering fit); *see also E.S. v. Regence BlueShield*, No. 2:17-cv-01609-RAJ, 2022 WL 279028, at *7 (W.D. Wash. Jan. 31, 2022) (rejecting conclusory allegation that non-disabled insured would not likely seek non-covered treatment as to make fit between classification and disabled plaintiffs plausible).

Plaintiffs here, however, did not allege invidious discrimination in their complaint, and pleaded no facts on the "fit" of any purported classification or the existence of an alleged motive for discrimination. Thus, the district court had nothing in the complaint to hang its hat on when finding that Plaintiffs "effectively" alleged proxy discrimination.

Alternatively, the district court ruled that the complaint "plausibly supports a claim of facial gender discrimination." ER-084. It again distinguished *Geduldig*, this time on the basis that while "the *condition* of pregnancy can be understood without reference to sex, gender, or transgender status, the *treatment* of gender dysphoria with genital reconstruction surgery cannot," ER-084-85—implicitly, because it alters sexual organs. But regulating the use of a procedure to alter sex organs *has to* refer to sex in some sense. That does not make it sex discrimination. *See L.W. by and through Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) ("*Williams I*") (explaining that ban on transition treatments for minors "mentions the word 'sex,' []. But how could it not? . . . . The reality that the [treatment's] effects correspond to sex in these understandable ways and that [the State] regulates them does not make" it sex discrimination).

Relatedly, the lower court equated having the surgery to treat other conditions with having the surgery to treat gender dysphoria. D36:8. But performing, say, a mammectomy to treat breast cancer is different than performing one to treat gender dysphoria. *See L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 481 (6th Cir. 2023) ("*Williams II*"). The two "stem from different diagnoses and seek different results." *Id.* Given this, "it follows that the cost-benefit analysis [differs] too, permitting States to legislate in the area without the assumption that they have presumptively violated the Constitution. States may permit varying treatments of distinct diagnoses, as the 'Constitution does not require things which are different in fact or opinion to be treated

in law as if they were in fact the same.'" *Id.* at 481-82 (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).

For these reasons, this Court should reverse on this point and hold that Plaintiffs have not stated a viable equal protection claim. But even if not, as shown next, it should hold that Dr. Hamso is entitled to qualified immunity on both the equal protection claims and the due process claims.

III.    ALTERNATIVELY, DR. HAMSO IS ENTITLED TO QUALIFIED IMMUNITY ON THE EQUAL PROTECTION CLAIMS BECAUSE NO BINDING CASE GAVE HER FAIR NOTICE THAT IT WAS CLEARLY ILLEGAL TO DENY COVERAGE FOR THE REQUESTED SURGERIES, AND THE EXTANT PRECEDENT ON THE STATES' AUTHORITY UNDER MEDICAID AND ON TRANSGENDER RIGHTS WAS MIXED.

For the equal protection claim, the district court defined the right at issue too broadly, that is, as "the right to be free from invidious discrimination," which it found "clearly established." ER-089-90. Though the district court acknowledged that there was "some nuance" to the claims here, the judge believed that its task at that stage was limited to whether the allegations stated a "plausible violation" of the general nondiscrimination principle that it articulated—which, it concluded, they did. ER-090. But that ruling is wrong on multiple levels: (a) it improperly defines the relevant right at too high a level of generality; (b) it ignores the absence of controlling authority on the limits of State discretion to regulate coverage for medical procedures, both in general and as to these specific procedures; and (c) it ignores the absence of controlling authority or consensus on the extent of transgender individuals' rights to receive

19

particular procedures under Medicaid. Any of these points would be a sufficient basis to reverse the district court's decision; together they make that decision wholly unsustainable.

### A. THE DISTRICT COURT DEFINED THE ASSERTED EQUAL-PROTECTION RIGHT AT MUCH TOO HIGH A LEVEL OF GENERALITY.

The district court fell into a common trap when denying equal protection claims: defining the asserted right at too high a level of generality. ER-089 (citing *Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980) and *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010)). As explained above, Plaintiffs did not plead invidious discrimination. But that general principle from *Flores* and *Elliot-Park*—two race-based policies cases—does not give ample notice of the overlapping and complicated medical and legal issues surrounding Medicaid patients seeking coverage for gender-dysphoric treatments.

In fact, the right alleged here is both narrower and deeper than the district court gave it credit for. It is narrower than discrimination writ-large because it occupies a slender channel: the right for coverage of a particular procedure to treat gender dysphoria. And the alleged right is deeper because lies at the confluence of two complex areas: the State's authority and discretion in administering Medicaid on the one hand, and transgender equal protection analysis on the other. No binding case settled those two questions together, and cases addressing them separately—and mostly, in other contexts—went both ways. This is the quintessential setting in which qualified immunity applies.

1. That conclusion is compelled by the reality that qualified immunity is a balance between two competing interests: (1) the interest of citizens in getting relief for state officials' violations of the law and (2) state actors' interests in performing their duties without undue interference. *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 813 (1982) (discussing interests and explaining that "public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."); *see also Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) (collecting cases).

State actors' interests rest on two policy rationales: (1) avoiding the risk of over-deterrence by ensuring that officials do not shy away from their duties, and (2) giving officials fair notice of liability. *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984). To avoid undue interference with their duties, executive officials must have right—within reason—to make the wrong call. *al-Kidd*, 563 U.S. at 743 (explaining that qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."); *see, e.g., Mitchell*, 472 U.S. at 535 (reversing lower court for rejecting immunity because the official "gambled and lost on the resolution of [an] open question"; "[t]he decisive fact is not that [the official's] position turned out to be incorrect, but that the question was open at the time he acted"); *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) ("In other words, an officer who makes a reasonable mistake as to what the law requires under a given set of circumstances is entitled to the immunity defense."). And fair notice protects the general presumption against

retroactive applications of new law. Nathan S. Chapman, *Fair Notice, The Rule of Law, and Reforming Qualified Immunity*, 75 Fla. L. Rev. 1, 16 (2023) (calling the "principle of prospectivity" a "linchpin of the rule of law").

Courts faced with qualified immunity claims consider at least one of two questions: (1) whether the facts alleged show the violation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. *al-Kidd*, 563 U.S. at 735. If the answer to either question is no, then qualified immunity applies. The court can address the elements in either order, and need only address one if it is dispositive. *Id.*

2.     Here, it is necessary only to address the second: whether the right was clearly established. Under Supreme Court precedent, "[t]o be clearly established, a right must be sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up) (emphasis added); *see also Saucier v. Katz*, 533 U.S. 194, 202 (2001). ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."). This must be viewed from the perspective of the official at the time the decision was made, filtering out the distorting effects of hindsight. *See, e.g., Mitchell*, 472 U.S. at 535 (reversing lower court for rejecting immunity because the official "gambled and lost on the resolution of [an] open question"; "[t]he decisive fact is not that [the official's] position turned out to be incorrect, but that the question was open

22

at the time he acted"); *Boyd*, 374 F.3d at 781 (citing *Saucier*, 533 U.S. at 205) ("In other words, an officer who makes a reasonable mistake as to what the law requires under a given set of circumstances is entitled to the immunity defense.").

"When properly applied," moreover, this standard—as the Supreme Court has held—"protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). This is particularly true on constitutional questions, given that changes in this area "are more likely and harder for officials to predict than changes to other judge-made areas of law." Chapman, *supra*, 75 Fla. L. Rev. at 9. And in this area, compounding the difficulties of legal prophecy is the unique moral censure that comes from being found to violate constitutional rights. *Id.* at 38-40.

3.      Given these realities, the most important part of correctly applying this standard is determining what the rule is. *See Anderson*, 483 U.S. at 639 ("The operation of [the qualified immunity] standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."). And the relevant right here would be a Medicaid recipient's right to Medicaid-funded sex-reassignment surgery.

Such precision in defining the relevant right is essential. Time and again, the United States Supreme Court has made clear that courts should not define the clearly established law too broadly, lest doing so swallow qualified immunity. *Id.* (explaining that if rule is defined too generally, "[p]laintiffs would be able to convert the rule of

qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."); *see also City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 613 (2015) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quoting *al-Kidd*, 563 U.S. at 742).

For this reason, the Supreme Court has required definition "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. This means specifying the rule to the case. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004)) ("The [clearly-established] inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'").

For example, in *Taylor v. Barkes*, 575 U.S. 822 (2015), a prisoner committed suicide. His family sued, saying that the lack of proper suicide protocols violated the Eighth Amendment. The Court defined the right at issue as an incarcerated person's "right to the proper implementation of adequate suicide prevention protocols." *Id.* at 826; *see also White v. Pauly*, 580 U.S. 73, 79 (2017) (requiring "case where an officer acting

24

under similar circumstances . . . was held to have violated the" Constitution). And that

is a good example of how specifically and narrowly the relevant right must be defined.[5]

Once the law is defined, determining the relevant rule—at the right level of

generality—requires examining the sources of relevant law. For constitutional

questions, the law that matters most is United States Supreme Court decisions, as the

final arbiter on the Constitution's meaning. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803)

("It is emphatically the province and duty of the judicial department to say what the law

is.").

This Court has also held that its own precedent can also clearly establish a right.

*See Boyd*, 374 F.3d at 781 ("If the right is clearly established by decisional authority of

the Supreme Court or this Circuit, our inquiry should come to an end."). And a binding,

on-point case is not always necessary. *See, e.g., Taylor v. Riojas*, 592 U.S. 7 (2020) (per

curiam) (holding no need for prior case that confining an inmate in a "shockingly

unsanitary" cell to clearly establish Eighth Amendment right to be held in sanitary

conditions). Even non-binding cases—from lower courts, state courts, and other

circuits—can be of (limited) use. *Ward v. Cnty. of San Diego*, 791 F.2d 1329, 1332 (9th

---

[5] Further, the Supreme Court has held that, to avoid qualified immunity, "[i]t is not enough that the rule is *suggested* by then-existing precedent. The precedent must be clear enough that every *reasonable* official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Colombia v. Wesby*, 583 U.S. 48, 63 (2018) (emphasis added). And it is the reasonableness of that decision, "not whether another reasonable, or more reasonable, interpretation of events can be constructed . . . after the fact," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), that controls.

Cir. 1986) (looking to "all available decisional law including decisions of state courts, other circuits, and district courts to determine whether the right was clearly established").[6]

4.      Where these sources are "complex and murky enough," *Daniels Sharpsmart*, 889 F.3d at 617—in identifying the pertinent level of generality or otherwise—the officials get a pass. For example, this Court has long held that the law is not "clearly established" where the extant authority discusses the same issue in a different *context*, *see, e.g., Doe by & through Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1452 (9th Cir. 1995) ("[I]t is not reasonable to charge [a defendant] at the time in question with the kind of knowledge, foresight, or even ingenuity required to anticipate that Title VII analogies might be used in this fashion to hold him individually liable" under another federal statute); where the Supreme Court "expressly" leaves a question open, *Mitchell*, 472 U.S. at 534; or even where there is just *some* case support for the official's position. *See al-Kidd*, 563 U.S. at 743 (holding law not clearly established against official where "eight Court of appeals judges agreed with his" position).

---

[6] The Supreme Court has never expressly said which sources courts should look to, precisely, nor clearly defined what "clearly established" means. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 n.32 (1982) (declining to define "the circumstances under which the state of the law should be evaluated by reference to the opinions of this Court, the Courts of Appeals, or of the local District court.") (cleaned up); *see also* Tyler Finn, Note, *Qualified Immunity Formalism: "Clearly Established Law" and the Right to Record Police Activity*, 119 Colum. L. Rev. 445 (2019), available at http://tinyurl.com/578bbakx.

At bottom, legal decisions aside from an on-point Supreme Court case are merely indirect evidence that a right was clearly and precisely established—that is, that the outcome never would have been in doubt from the standpoint of the actor at the time. *See, e.g., Mitchell*, 472 U.S. at 533 (noting, after canvassing supreme court precedent, that "[u]ncertainty regarding" the legal question at issue "is also reflected in the decisions of the lower federal courts."); *Anderson*, 483 U.S. at 640 (explaining that qualified immunity does not require previous holding of unlawfulness, but "unlawfulness must be apparent" "in light of pre-existing law"); *Boyd*, 374 F.3d at 781 ("[W]hen 'there are relatively few cases on point, and none of them are binding', we may inquire whether the Ninth Circuit or Supreme Court, at the time the out-of-circuit opinions were rendered, would have reached the same results.") (cleaned up).

By contrast, the existence of conflicting rulings across courts itself shows that a matter is not beyond debate—and thus *not* clearly established. *See Reichle*, 566 U.S. at 669-70 ("As we have previously observed, '[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.'") (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999)); *see also Sheehan*, 575 U.S. at 611.

5.  To be sure, M.H. and T.B. have described the violation of their equal protection rights as following from the "policy that genital surgery for treatment of gender dysphoria is cosmetic and as a result not medically necessary," and that IDHW does not cover the costs of such treatments for that reason. ER-194 ¶¶ 85, 87-88. As a

result of this alleged policy, Plaintiffs allege that the requested surgeries were not authorized as of May 2022. ER-205 ¶ 156; ER-210 ¶ 188.[7] They characterize the "policy of refusing to authorize [sex reassignment surgery] for the treatment of gender dysphoria" as sex and transgender discrimination in violation of the Equal Protection Clause. ER-211 ¶ 193.

But these facts, even taken as true and in the light most favorable to M.H. and T.B., do not establish a violation of a clearly established right. Given the specificity requirement for clearly established rights, the relevant right here is a Medicaid recipient's right to *Medicaid-funded* sex-reassignment surgery. But in fact, there is no such right. At no point—not at the motion to dismiss stage, nor in the Court's order, nor even in their response to the pending motion to certify other questions for interlocutory appeal—have M.H. and T.B. cited a single binding case showing a clearly established right to sex-reassignment surgery funded by Medicaid. That is because there is none. Nor is there other circuit or lower-court consensus on it. *See Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (2017) (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). And that is sufficient to entitle Dr. Hamso to qualified immunity.

---

[7] The possible relevant dates for the challenged decision in this case span from March 2021 (when M.H. was denied coverage for lack of medical necessity, ER-065) to May 2022 (when T.B. sought approval, ER-068-70). Dr. Hamso uses the latter.

**B.** **THERE IS NO CONTROLLING AUTHORITY OR OTHER CONSENSUS ON THE LIMITS OF STATE DISCRETION TO REGULATE THE MEDICAL PROCEDURES FUNDED BY MEDICAID GENERALLY, LET ALONE THESE SPECIFIC PROCEDURES.**

Here, in fact, the relevant authorities are all over the lot. On medical procedures generally, the Supreme Court has held that individuals have a constitutional right to *refuse* treatment, *Washington v. Glucksberg*, 521 U.S. 702, 725-26 (1997), but it has not held that an individual has an unfettered constitutional right to *get* a particular treatment. Indeed, shortly after the relevant time here, the Supreme Court overruled what precedent there was for the Constitution's requiring (within certain bounds) a controversial medical procedure. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (overruling *Roe v. Wade*, 410 U.S. 113 (1973)). And most circuits have "rejected arguments that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710 & n.18 (D.C. Cir. 2007) (collecting cases); *see also Williams II*, 83 F.4th at 473 ("This Country does not have a 'deeply rooted' tradition of preventing governments from regulating the medical profession in general or certain treatments in particular, whether for adults or their children."). Quite the contrary: as the Sixth Circuit recently put it, "State . . . governments have long played a critical role in regulating health and welfare, which explains why their efforts receive a 'strong presumption of validity.'" (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Further, having a constitutional right of access to a

29

medical procedure does not equal a constitutional right to have the government *fund* that medical procedure. *See Harris v. McRae*, 448 U.S. 297, 316 (1980) ("[I]t simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices.").

As this Court has recognized, moreover, Medicaid and its implementing regulations give States significant discretion to set limits on government-funded procedures and to determine medical necessity. *See Beal*, 432 U.S. at 438 (holding no equal protection violation from States declining to fund nontherapeutic abortions and recognizing that states have "broad discretion . . . to adopt standards for determining the extent of medical assistance" and can "refuse to fund unnecessary though perhaps desirable medical services"); *see also Maher v. Roe*, 432 U.S. 464 (1977) (same, and State can choose to alternatively fund childbirth); *Katie A., ex rel. Ludin v. Los Angeles Cnty.*, 481 F.3d 1150, 1159 (9th Cir. 2007) (explaining that Medicaid and its regulations require States to provide necessary services, but have "discretion as to how to do so").

Other circuits have held similarly, and at least one circuit has held that this discretion extends to excluding coverage for sex-reassignment surgeries. *Rush v. Parham*, 625 F.2d 1150, 1157-58 (5th Cir. 1980) (remanding for further proceedings on equal protection claim against state Medicaid refusal to fund transsexual surgery, but holding that states "may define medical necessity to exclude experimental surgery"); *Smith v. Rasmussen*, 249 F.3d 755, 759 (8th Cir. 2001) (explaining that recipient states have some discretion to determine medical necessity, and "may place appropriate limits on a

30

service based on such criteria as medical necessity or on utilization control procedures" (quoting 42 C.F.R. § 440.230)); *Garrido v. Dudek*, 731 F.3d 1152, 1154 (11th Cir. 2013) ("The Medicaid Act and its implementing regulations grant the authority to the states to set reasonable standards for the terms 'necessary' and 'medical necessity.'" (citing 42 U.S.C. § 1396a(a)(17); 42 C.F.R. § 440.230(d)); *cf. Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 182 (2023) ("[L]ike other aspects of Medicaid, FNHRA anticipates 'cooperative federalism'—*i.e.*, federal and state actors working together—to carry out the statute's aims.") (citation omitted); *but see Vista Hill Found., Inc. v. Heckler*, 767 F.2d 556, 561 (9th Cir. 1985) ("[P]hysicians, not administrative agencies, have responsibility for determining what constitutes necessary medical treatment.").[8] And

---

[8] This statement from *Vista Hill* appears overbroad, given the cases cited above, including *Beal v. Doe*, 432 U.S. 438 (1977). And deference to State discretionary decisions is particularly apt in areas of "medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). Courts intervening risk "assum[ing] authority over an area of policy that is not theirs to regulate" and "impos[ing] a constitutional straitjacket on [state policy] choices before anyone knows how that 'medical and scientific uncertainty' will play out." *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023) ("*Williams II*").

The medical establishment is not "of one mind about using hormone therapy" or other treatments for gender dysphoria. *L.W. by & through Williams v. Skrmetti*, 73 F.4th 408, 416 (6th Cir. 2023) ("*Williams I*"). And Courts do not defer to experts on the interpretation of statutes governing that area of expertise. *Id.* ("That many members of the medical community support the plaintiffs is surely relevant. But it is not dispositive for the same reason we would not defer to a consensus among economists about the proper incentives for interpreting the impairment-of-contracts or takings clauses of the U.S. Constitution."). "Many medical professionals and many medical organizations may disagree" with treatments for gender dysphoria. [cite needed] "But the Constitution does not require [a state] to view these treatments in the same way as the majority of experts[.]" *Id.* at 418.

again, the existence of compelling circuit authority allowing Medicaid administrators to decline coverage of sex-reassignment surgery entirely is a sufficient basis to grant qualified immunity to Dr. Hamso.

### C. THERE IS NO CONTROLLING AUTHORITY OR OTHER CONSENSUS ON THE FULL EXTENT OF INDIVIDUALS' RIGHTS TO RECEIVE COVERAGE FOR PARTICULAR GENDER-DYSPHORIC TREATMENTS UNDER MEDICAID.

In any event, the line for transgender medical treatments for adults under Medicaid in particular is far from settled.

1. The Supreme Court, for example, has not addressed that issue at all. And this Court has not addressed it for adults, but in the midst of the relevant dates here *upheld* the denial of a preliminary injunction against Arizona's law forbidding transgender treatments for minors. *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022). The results from other circuits are mixed, and litigation is ongoing.[9]

Even the federal Executive Branch (as of May 2022) refused to require funding for such surgeries, at least under Medicare. The Obama administration concluded twice

---

[9] *See Williams I*, 73 F.4th at 421 (citing cases); *Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 6516449 (N.D. Okla. Oct. 5, 2023) (rejecting equal protection claim regarding state statute prohibiting sex-reassignment treatment for minors, applying rational basis review); *K.C. v. Individual Members of Med. Licensing Bd.*, No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086 (S.D. Ind. June 16, 2023) (ruling likelihood of success on equal claim from transgender minors challenging surgery and hormone-therapy exclusions), *appeal docketed*, No. 23-2366 (7th Cir. July 12, 2023); *Dekker v. Weida*, No. 4:22-cv-325-RH-MAF, 2023 WL 4102243 (N.D. Fla. June 21, 2023) (striking down state ban on transgender treatments for minors and adults on equal protection grounds, but dismissing surgery claims for lack of standing), *appeal docketed,* No. 23-12155 (11th Cir. June 27, 2023).

in one year (2016) that the evidence for the benefits of such surgery was "inconclusive," to the point that it refused to issue a national coverage determination that would have mandated its coverage under Medicare. *See* Ctrs. for Medicare & Medicaid Servs., *CAG-00446N, Gender Dysphoria and Gender Reassignment Surgery* (June 2, 2016), available at https://tinyurl.com/zus5cd32; *id.* (Aug. 30, 2016), https://tinyurl.com/bdhp69au.

In the absence of a mandate, almost every state—and the District of Columbia and Puerto Rico—have been actively legislating in this fraught area. *See* Elliott Davis, Jr., *States that Have Restricted Gender-Affirming Care for Trans Youth in 2023*, U.S. News (Sept. 27, 2023, 2:15 PM), https://tinyurl.com/29fhk4s3 (providing links to state bills). And the policies are all over the map, from explicit provision (26 States and D.C.) to no clear policy (12 states) to explicit prohibition (3 for minors, 9 for minors and adults). *See* Movement Advancement Project, *Healthcare Laws and Policies: Medicaid Coverage for Transgender-Related Health Care* (Aug. 26, 2023), https://tinyurl.com/2hdch9up.

All this rendered the law unsettled in May 2022, placing IDHW's policy decisions in the realm of good faith disagreement—at very least—not "beyond debate." *Doe*, 28 F.4th at 114-15; *see also Sharp*, 871 F.3d at 910. While M.H. and T.B. "invoke constitutional precedents of the Supreme Court and this Court, not one of them resolves these claims." *Williams I*, 73 F.4th at 415. Thus, the Plaintiffs here must necessarily "seek to extend the constitutional guarantees to new territory." *Id.* And that very need for extension establishes that qualified immunity is required here.

2. To the extent that other courts have addressed transgender issues regarding surgery, equal protection claims, or both, the results have been—again—mixed. For example, some courts have held that it violates the constitution to deny the sought-for surgeries here,[10] others have held that it does not.[11]

Notably, moreover, several courts have recently granted qualified immunity on these and similar claims.[12] And in the prison context, some courts have held that it

[10] *Kadel v. Folwell*, 620 F. Supp. 3d 339 (M.D.N.C. 2022) (ban on state health insurance providing sex change/modification services violates equal protection; *Flack v. Wisc. Dep't of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019) (holding that state denial of Medicaid coverage for surgery and related hormones violated equal protection); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1004-05 (W.D. Wisc. 2018) (similar claims to here, but for state employees under public employee plan; violates equal protection, but officials entitled to qualified immunity, based on "rapid development of the law in this area"); *see also Fletcher v. Alaska,* 443 F. Supp. 3d 1024 (D. Alaska 2020) (holding state violated Title VII by denying state employee surgery as treatment for gender dysphoria); *Doe v. Minn. Dep't of Pub. Welfare*, 257 N.W.2d 816 (Minn. 1977) (striking down prohibition on state-funded sex-reassignment surgeries).

[11] *Denise R. v. Lavine*, 383 N.Y.S.2d 568 (N.Y. 1976) (upholding denial of social services funding for sex-reassignment surgery)

[12] *Clark v. Quiros*, No. 3:19-cv-00575-VLB, 2023 WL 6050160 (D. Conn. Sept. 15, 2023) (ruling no qualified immunity for Eighth Amendment claim for not adequately treating prisoner with gender dysphoria); *Lange v. Houston Cnty.*, 499 F. Supp. 3d 1258, 1280 (M.D. Ga. 2020) (granting qualified immunity, noting that no case "clearly establish[ed] that adopting an exclusion in a health plan is discriminatory" or violates equal protection); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1004-05 (W.D. Wis. 2018) (ruling that officials entitled to qualified immunity based on "rapid development of the law in this area"); *Jones v. Union Cnty. Sheriff's Off.*, No. 3:18-cv-509-KDB-DCK, 2019 WL 7708935, at *13 (W.D.N.C. Sept. 23, 2019) (ruling that sheriff was entitled to qualified immunity where rules about transgender housing of inmates and equal protection were "rapidly evolving" and no decision required it); *but see Clark v. Quiros,* No. 3:19-cv-00575-VLB, 2023 WL 6050160 (D. Conn. Sept. 15, 2023) (ruling no qualified immunity for Eighth Amendment claim for not adequately treating prisoner with gender dysphoria).

violates the Eighth Amendment to deny the sought-for surgeries,[13] others have held

that it does not.[14]

---

[13] *See Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011) (holding Eighth Amendment violation from state statute forbidding hormone and surgery treatments for gender dysphoria, but not addressing equal protection claim); *Soneeya v. Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012) (similar); *Iglecias v. Fed. Bureau of Prisons*, No. 19-CV-415-NJR, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021) (similar); *Fain v. Crouch*, 618 F. Supp. 3d 313 (S.D.W.V. 2022) (holding that state Medicaid plan not covering surgery for treatment of gender dysphoria violated equal protection); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *12 (W.D. Mo. Feb. 9, 2018) (citing cases, ruling that decision to provide some, but not all, requested treatment to inmate suffering from gender dysphoria violated Eighth Amendment); *see also Manning v. Goord*, No. 05-CV-850F, 2010 WL 883696 (W.D.N.Y. Mar. 8, 2010) (denying qualified immunity to prison officials based on denial of treatment for gender dysphoria); *cf. Edmo v. Corion, Inc.*, 935 F.3d 757 (9th Cir. 2019) (holding that it is possible to violate the Eighth Amendment by refusing sex-reassignment surgery, but it depends on the facts); *Kothmann v. Rosario*, 558 F. App'x 907 (11th Cir. 2014) (per curiam) (denying motion to dismiss prisoner's Eighth Amendment complaint on denial of hormone therapy).

[14] *See Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (holding that denying sex-reassignment surgery to transgender inmate did not violate Eighth Amendment); *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019) (denial of sex-reassignment surgery does not violate Eighth Amendment); *Williams v. Kelly*, 818 F. App'x 353 (5th Cir. 2020) (per curiam) (holding no Eighth Amendment violation from denial of sex-reassignment surgery); *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401 (Table), 1997 WL 34677, at *3-4 (6th Cir. 1997) (per curiam) (unpublished) (holding, in Eighth Amendment context, that prisoner "does not have a right to any particular type of treatment, such as estrogen therapy . . . . [G]iven the wide variety of options available for the treatment of gender dysphoria and the highly controversial nature of some of those options, a federal court should defer to the informed judgment of prison officials as to the appropriate form of medical treatment."); *Druley v. Patton*, 601 F. App'x 632 (10th Cir. 2015) (holding no Eighth Amendment right to hormone therapy for transgender inmate, and that transgender is not a suspect class warranting heightened scrutiny); *see also Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019) (holding qualified immunity applied to Eighth Amendment claim against prison officials for denial of transgender surgery); *Jones*, 2019 WL 7708935, at *13 (ruling that sheriff was entitled to qualified immunity where rules about transgender housing of inmates and equal protection were "rapidly evolving" and no decision required it).

In the context of public schools and transgender minors' rights, some courts have held that it violates equal protection to segregate public school restrooms by biological sex,[15] others have held the opposite.[16]

In the context of statewide bans for sex-reassignment procedures for minors, courts are also split, with the Sixth Circuit overturning a preliminary injunction against one law, while the District of Idaho just this week granting a preliminary injunction prohibiting enforcement of another.[17]

As the case citations above show, these mixed results have continued after the relevant dates of decision here. While later decisions were not available to give notice to the officials at the time, and thus cannot show that the right *was* clearly established, continuing division on the issue can provide further evidence that the right here was *not* clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 244-45 (2009) (holding qualified

---

[15] *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) (holding equal protection violation for separating bathrooms by sex rather than gender identity); *Whitaker by & through Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034 (7th Cir. 2017) (same). Addressing a mirror-imaged policy, this Court held in *Parents for Privacy v. Barr,* 949 F.3d 1210, 1228 (9th Cir. 2020) that because a transgender bathroom policy applied to both sexes, it did not discriminate on the basis of sex under Title IX.

[16] *Adams by & through Kasper v. Sch, Bd. of St. John's Cnty.*, 57 F.4th 791 (11th Cir. 2022) (holding no equal protection violation for separating bathrooms by sex rather than gender identity); *Roe v. Critchfield*, No. 1:23-cv-00315, 1012 WL 6690596 (D. Idaho Oct. 12, 2023) (denying preliminary injunction on equal protection claim by transgender students against sex-segregated bathroom policy).

[17] *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023); *Poe v. Labrador*, No. 1:23-cv-00269-BLW, slip op. (D. Idaho Dec. 26, 2023), ECF No. 78.

immunity applied where existing cases supported officials' actions and looking at later-developed splits as evidence that rule not clearly established).

3.      The best that the district court could do below in ruling otherwise was point to *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). ER-090. But the Supreme Court in that case specifically reserved questions outside of the Title VII context there. *Bostock*, 140 S. Ct. at 1753 ("Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind."). How a reasonable official is supposed to generalize from application of statute in the Title VII context to the equal protection and due process requirements of the Constitution is left unsaid.

The Court's express limitation of its decision alone prevents the rule from being clearly established. *See Mitchell*, 472 U.S. at 534. And at least two recent circuit decisions (albeit involving minors) have properly distinguished *Bostock* from the medical context. *Williams II* at 420; *Eknes-Tucker,* 80 F.4th at 1228-29.

4.      To be sure, this Court's decision in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) was extant at the time of the decisions here, and this court has since clarified that *Karnoski* established transgender status as a quasi-suspect class whose regulation must pass intermediate scrutiny. *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023) (citing *Karnoski*, 926 F.3d at 1200-01).[18] But it is questionable whether a reasonable

---

[18] This construction is at least somewhat dubious given that *Karnoski* conducts no real discussion of the district court's determination of class status, instead relying on prior Ninth Circuit caselaw concerning sex and sexual orientation. But as discussed, the mere

officer would have believed that transgender status constituted a quasi-suspect class after that decision. The Court did not say so explicitly there. Instead, it held merely— with little analysis—that the level of scrutiny lay somewhere between rational basis and strict scrutiny. *Karnoski*, 926 F.3d at 1201. That sort of imprecise and little-reasoned conclusion fails to give the necessary notice to decision makers that a definitive change has been made. Indeed, this Court felt the need in *Hecox*—despite the existence of *Karnoski*—to go through the necessary analysis. *Hecox*, 79 F.4th at 1028.

Moreover, a reasonable official could decide that, even given *Karnoski*, it was no foregone conclusion that the holding would hold up, given the law in other circuits and Supreme Court reluctance to expand this sort of classification. As the Sixth Circuit recently explained, "[t]he bar for recognizing a new quasi-suspect class is a high one," and the Supreme Court "has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *Williams I*, 73 F.4th at 420 (cleaned up); *see also Salaam v. Stock*, No. 9:19-cv-00689-AMN-TWD, 2023 WL 3579770, at *5-6 (N.D.N.Y. May 22, 2023) (citing cases on "lack of uniformity" among courts on "whether transgender plaintiffs are members of a protected class whose equal protection claims are entitled to heightened scrutiny."); *White v. City of New York*, 206 F. Supp. 3d 920, 933 (S.D.N.Y. 2016) (similar); *see also Etsitty v. Utah Transit Auth.*, 502 F.3d

---

identification of the class as quasi-suspect in 2019 puts no reasonable 2022 official on notice that a specific Medicaid denial is disallowed or reviewed for anything but rational basis.

1215 (10th Cir. 2007) (holding transgender status not a protected class under EPC), *overruled on statutory grounds by Bostock*, 140 S. Ct. 1731.

Even if *Karnoski* put a reasonable officer on notice that transgender status was quasi-suspect, it is a military case that says nothing about Medicaid funding, nothing about medical treatments, nothing about entitlements, and nothing about how scrutiny should be practically applied. *See Harrison v. Kernan*, No. 16-cv-07103-RMI, 2021 WL 4295303, at \*4 (N.D. Cal. 2021) (quoting *Anderson*, 483 U.S. at 640). Even if it did, that principle does not require a finding that that Dr. Hamso violated clearly established law. Not all sex discrimination, or for that matter transgender discrimination, is invidious or "proscribed" in all cases: both may be overcome with intermediate scrutiny. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).

5.      Nor was Dr. Hamso on notice that a classification based on medical *procedure* necessarily discriminates on the basis of sex or transgender status. In *Geduldig*, the Supreme Court held that even where a form of medical care may only be given to one sex (women in the case of pregnancy), a failure to provide it by a state's insurance program is not a denial of equal protection.

This Court's decision in *Dexter v. Kirschner* further reinforced this principle. 984 F.2d 979 (9th Cir. 1992). There, this Court considered whether Arizona's decision to fund one kind of bone marrow transplant rather than another violated equal protection. *Id.* at 981. As relevant here, the Court chose to analyze this question at the level of treatment and in line with the general principle that the determination that a state will

39

fund a procedure through Medicaid is "state regulation in the social and economic field." *Id.* at 986-87 (citing *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)). Consequently, the Court found that Arizona's decision to fund one procedure rather than another was rational and was not an equal protection violation.

Armed with this authority, at a minimum, Dr. Hamso had no indication in 2022 that denial of Medicaid funding for one set of treatments for a single condition could constitute an equal protection violation. Both *Geduldig* and *Dexter* analyzed equal protection claims at the level of *treatment* before looking at whether a protected class was potentially affected, and consequently both utilized rational basis as the standard of review.

Here, by contrast, the challenge is to the denial *funding* for one kind of procedure for gender dysphoria: sex-reassignment surgery. No Ninth Circuit case in 2022 held that denial of this procedure, much less the denial of government funding, violates equal protection. No Ninth Circuit case even came close to putting Dr. Hamso on notice that the alleged conduct in 2022 violated M.H. and T.B.'s equal protection or due process rights. And ultimately Dr. Hamso would have been reasonable in relying on, at a minimum, *Geduldig* and *Dexter* in the absence of other elaboration in this Court or the Supreme Court on whether equal protection required funding for a particular treatment for a particular disease. As a result, far short of placing the issue "beyond debate," as required to breach qualified immunity, the law gave Dr. Hamso ample grounds for not

authorizing funding for the sex-reassignment surgeries. The district court erred by finding otherwise and reversal is warranted on this ground alone.

Because no equal protection right was violated in the denial of funding for a particular medical service for one medical condition, qualified immunity for Dr. Hamso is required, and this Court should reverse.

## IV. THE DISTRICT COURT ERRED BY DENYING QUALIFIED IMMUNITY TO DR. HAMSO ON PLAINTIFFS' DUE PROCESS CLAIMS GIVEN THE LACK OF PROPERTY INTEREST IN A SURGERY THAT HAS NOT BEEN COVERED UNDER IDAHO LAW.

The district court also erred in denying qualified immunity on M.H.'s and T.B.'s due process claim. It first assumed that Dr. Hamso had conceded the existence of a constitutional right, ER-092 at n.12, and analyzed only whether it was clearly established. *Id.* It then ruled that they had a clearly established "property interest in continuing to receive government benefits" and that because the sought-for surgeries were available to "cisgender individuals for medically necessary reasons applying to them," Plaintiffs had a "legitimate claim of entitlement to coverage, not just [a] unilateral expectation of it." ER-093-94. In so ruling, the district court both misconstrued Dr. Hamso's position and over-generalized the right at issue.

Dr. Hamso did not concede the existence of a constitutional right here; quite the contrary. A property (or liberty) interest is prerequisite to a constitutional entitlement to due process, *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972), and Dr. Hamso consistently argued that that prerequisite was not present. ER-174; ER-027. For

purposes of this claim, it is this specific property interest that must be clearly established. It was not.

Further, as the Supreme Court has held, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation omitted). And in the discretionary context, "'[a] reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which entitlement is couched in mandatory terms.'" *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994) (cleaned up).

Thus, this Court has correctly held that it is only when a law "imposes significant limitations on the discretion of the decision maker" that a property interest in a government benefit arises. *Gerhart v. Lake Cnty.*, 637 F.3d 1013, 1019 (9th Cir. 2011) (citation omitted). "A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government." *Id.* at 1020.

As shown above, the Medicaid statutes give state officials discretion to decide the medical necessity of particular treatments, and the contours of that discretion in this setting have not been fully defined. *See Beal*, 432 U.S. at 440; *see also* 42 C.F.R § 440.230(d). And the legal question of the level of discretion that defeats a property

42

interest is—at least—debatable here. S*ee, e.g., Ressler v. Pierce*, 692 F.2d 1212, 1214-16 (9th Cir. 1982) (discussing cases ranging from "unbridled discretion" to "closely circumscribe[d]" discretion). And that sort of gray area is precisely the space in which qualified immunity exists to protect officials' exercise of discretion, and requires at least fair notice of where the lines are.

In ruling to the contrary, the district court (again) defined the right at issue too broadly. No one contests that M.H. and T.B. are entitled to continue receiving Medicaid coverage in general. The question is how far and to what procedures, exactly, that coverage should extend. And the fact that the same treatment is available for different maladies—while relevant to an equal protection inquiry—is neither here nor there on a due process claim. It still leaves unanswered the question of whether there is a right to a particular treatment for the condition here (gender dysphoria). There is no binding authority for the existence of *that* right.

And there is recent authority supporting Dr. Hamso's exercise of discretion. Shortly before Dr. Hamso's decisions here, the Northern District of Illinois decided *M.F. ex rel. R.L. v. Magellan Healthcare, Inc.*, No. 20CV3928, 2021 WL 1121042 (N.D. Ill. Mar. 24, 2021). There, a state-sponsored health-care plan provider (Magellan) denied treatments to violent teens with mental disorders. *Id.* at *2. Some teens alleged that intensive inpatient treatment was medically necessary, and that the guidelines used by the provider "conflicted with generally accepted standards of care." *Id.* at *3. The district court ruled that there was no protectible property interest in a particular

treatment because the officials had discretion to determine medical necessity. *Id.* at *4. While "the state may have created a vested right to healthcare benefits, plaintiffs' theory depend[ed] on a more specific property right: a vested right to coverage for medically necessary treatment with a definition of necessity that is discretionary (albeit subject to professional standards)." *Id.* (citation omitted). But this did not bear the hallmarks of a protectible interest because the benefits were "too contingent on [the provider's] discretion to establish a secure and durable property right." *Id.* Here, Dr. Hamso could reasonably rely on that legal reasoning. *See* 42 C.F.R. § 431.220(b) (hearing not required "if the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all beneficiaries"); *see, e.g., Rosen v. Goetz,* 410 F.3d 919, 932-33 (6th Cir. 2005); *Detgen ex rel. Detgen v. Janek,* 945 F. Supp. 2d 746, 659-60 (N.D. Tex. 2013) (rejecting due process claim where state agency determined that particular device was out of plan). And that fact also requires that she be granted qualified immunity on the Plaintiffs' due-process claim.

## CONCLUSION

Qualified immunity is essential to State officials' abilities to do their jobs in serving their citizens. But here, at every turn, the district court misinterpreted or ignored the relevant precedents establishing that the law in this important area is simply too unsettled to warrant imposing liability on Dr. Hamso for not approving funding for the invasive treatments Plaintiffs sought. For these reasons and those articulated above, the district court's order should be reversed and the case remanded with instructions to

dismiss the claims against Dr. Hamso in her personal capacity, and to dismiss the equal protection claims for failure to state a claim.

December 27, 2023                    Respectfully submitted,

*s/ Gene C. Schaerr*
GENE C. SCHAERR
JOHN J. NIELSEN
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

RAUL R. LABRADOR
*Attorney General*
JOSHUA N. TURNER
*Acting Solicitor General*
AARON M. GREEN
JAMES E.M. CRAIG
IDAHO OFFICE OF THE
ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
josh.turner@ag.idaho.gov

*Counsel for Defendant-Appellant*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, counsel for Appellant is unaware of any related cases pending in this Court.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Circuit Rule 32-1 because:

    ☒    this brief contains 11,935 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

    ☐    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond, *or*

    ☐    this brief has been prepared in a monospaced spaced typeface using (state name and version of word processing program) _____ _____ with (state number of characters per inch and name of type style) _____ _____ _____.

December 27, 2023            */s/ Gene C. Schaerr*
                               Gene C. Schaerr

                               *Counsel for Defendant-Appellant*